**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SALLY MYERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 07-CV-6197 |
| | ) | |
| LIFE INSURANCE COMPANY | ) | Judge Robert M. Dow, Jr. |
| OF NORTH AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Currently pending before the Court are cross motions for summary judgment filed by Plaintiff Sally Myers [21] and Defendant Life Insurance Company of North America [31]. For the following reasons, Plaintiff's motion for summary judgment [21] is denied and Defendant's motion for summary judgment [31] is granted in part and denied in part.

**I.      Background**

Plaintiff Sally Myers ("Plaintiff" or "Myers") filed a complaint initiating this action against Defendant Life Insurance Company of North America ("Defendant" or "LINA").[1] The complaint, brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(e)(1), (f), seeks review of LINA's termination of Plaintiff's long term disability benefits and denial of her request for a waiver of life insurance premiums.

Plaintiff suggests that if the Court cannot decide this motion on summary judgment, a "paper trial" pursuant to Fed. R. Civ. P. 52 would be an appropriate alternative for resolution of the remaining issues. The Rule 52 procedure can be an efficient method of disposition in ERISA

---

[1] LINA occasionally refers to a separate entity, CIGNA, without indicating the substance or basis of that relationship. For the sake of consistency, the opinion will refer exclusively to LINA as it is the sole named defendant.

denial of benefit cases and has been utilized frequently in this district. See *Juszysnki v. Life Ins. Co. of N. Am.*, 2008 WL 877977 (N.D. Ill. Mar. 28, 2008); *Rudzinski v. Metro. Life Ins. Co.*, 2007 WL 2746630 (N.D. Ill. Sept. 14, 2007). As Magistrate Judge Denlow has summarized, "the summary judgment process has the potential for a non-decision, extra litigation, additional costs, and unnecessary delay," all of which can be "eliminated by proceeding by means of a trial on the papers." *Crespo v. UNUM Life Ins. Co.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003). However, LINA requests a bench trial if the cross motions for summary judgment are denied, which is its right. See *id.* (observing that by "filing cross-motions for summary judgment, parties do not waive their right to a trial on the merits"). The Court therefore proceeds solely under Fed. R. Civ. P. 56.

## II.      Facts[2]

Plaintiff Sally Myers ("Plaintiff" or "Myers") was employed full-time as a "Community Manager" with Belmont Village, a nursing home, from August 28, 2001 until February 13, 2006 when she ceased working as a result of an injury to the anterior cruciate ligament ("ACL") in her right knee. Def. SOF ¶¶ 8, 17; Pl. SOF ¶¶ 5-6. Upon examination, she was diagnosed with a torn right ACL and she underwent reconstructive surgery.[3] Pl. SOF ¶ 6.

### *The Plan*

As a benefit of her employment with Belmont Village, Myers was insured under a long term disability insurance policy ("LTD Policy") and a life insurance policy ("Life Policy")

---

[2] The relevant facts are taken from the Plaintiff's Local Rule 56.1 statement of facts ("Pl. SOF") and Defendant's Local Rule 56.1 statement of facts ("Def. SOF"). The parties often cite to the same document, although they selectively choose the language. In those instances, the Court includes both citations and considers the document in entirety. Where the parties disagree over relevant facts, the Court sets forth the competing versions. Finally, the Court resolves genuine factual ambiguities in the respective non-movant's favor. See *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

[3] Myers previously underwent surgery to repair the same ACL in 2004. Pl. SOF at ¶ 11

(collectively "the Plan"). Pl. SOF ¶ 7. Both policies of The Plan were underwritten and insured by LINA. *Id.* After she stopped working at Belmont Village on account of her injury, Myers sought short-term disability ("STD") benefits, and when those expired, LTD benefits under the Plan, as well as a waiver of life insurance premium payments.

Under the STD Policy, "You are Disabled, if as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation."[4] The LTD Policy further states that "[w]e will pay Disability Benefits if you become Disabled while covered under this Policy. You must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy. You must provide to us, at your own expense, satisfactory proof of Disability before benefits will be paid. The Disability Benefit is shown in the Schedule of Benefits. We will require continued proof of your Disability for benefits to continue." Def. SOF ¶ 13.

The Employee is considered Disabled pursuant to the LTD Policy for the first 24 months in which benefits are payable if, "solely because of Injury or Sickness, he or she is: 1. unable to perform all the material duties of his or her Regular Occupation; or 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation." Pl. SOF ¶ 8; Def. SOF ¶ 11. "Regular Occupation" is defined for purposes of the LTD Policy as: "The occupation you routinely perform at the time the Disability begins. In evaluating the Disability, we will consider the duties of the occupation as it is normally performed in the general labor

---

[4] The definition of disability for STD benefits under the Plan was not included by either party in their 56.1 statements of fact. However, it is included in the administrative record and therefore will be considered. See Administrative Record, pg. 1216.

market in the national economy.  It is not work tasks that are performed for a specific employer or at a specific location."  Def. SOF ¶ 12.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled under the LTD policy if, "solely due to Injury or Sickness, he or she is: 1. unable to perform all the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; or 2. unable to earn 80% or more of his or her Indexed Earnings.  We will require proof of earnings and continued disability."  Pl. SOF ¶ 8; Def. SOF ¶ 11.

Disability has a different definition under the Life Policy (which is applicable to the waiver of premium benefit):  "An employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience."  Def. SOF ¶ 15; Pl. SOF ¶ 9.  The Life Policy also contains the following language: "For plans subject to the Employee Retirement Income Security Act (ERISA), the Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has selected the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims.  In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact.  All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law."  Def. SOF ¶ 16.

Under the "Continuation of Service" heading of the Life Policy, and the subheading "Waiver of Premium," the policy states, "If an Employee is under age 60 and his or her Active

Service ends due to Disability, Life Insurance Benefits as shown in the Schedule of Benefits will continue until the end of the earliest of the following dates: 1. The date of the Employee is no longer Disabled; 2. The date he or she no longer qualifies for Waiver of Premium; 3. The day after the period for which premiums are paid; 4. The date the Maximum Benefit Period for this benefit, if any, ends." Pl. SOF at ¶ 9.

### *Claim History*

On February 13, 2006 orthopedist Dr. Christ Pavlatos stated that Myers had been "followed" at the Illinois Bone and Joint Institute for her right knee, which had been doing fine but had recently given out while she was walking down stairs. Pl. SOF ¶ 12. On March 28, 2006, Myers was evaluated by Dr. Roger Collins regarding her right knee. *Id.* ¶ 13. The physical examination revealed that "she has pain anterolaterally," "she is tender anteromedially and anterolaterally," "she has tenderness at the lateral and anterolateral joint line," but "there is no tenderness at the medial joint line." *Id.* Dr. Collins' assessment noted the failed ACL reconstruction in 2004. *Id.* Myers requested that Dr. Collins proceed with another ACL reconstruction surgery. *Id.* On April 18, 2006 LINA approved Plaintiff's claim for STD benefits through May 13, 2006. Def. SOF ¶ 18; Pl. SOF ¶ 40.

On May 8, 2006 Dr. Luis I. Salazar wrote a letter stating that Myers was under his care for multiple issues, including hypertension, anxiety, and insomnia. Pl. SOF ¶ 14. On May 9, 2006, Dr. Collins wrote a letter answering questions posed by Mr. William J. Provenzano. Pl. SOF ¶ 15; Def. SOF ¶ 20. The letter noted that Myers had sustained an injury to her right knee in July 2004 and had undergone reconstructive surgery on her right ACL on August 2, 2004. *Id.* According to the letter, Myers reported that she continued to experience pain, swelling and soreness in the knee since the initial surgery and that the knee got progressively worse over the

previous six months.  *Id*.  The letter also notes that Myers saw her original surgeon in January of 2006 and that he obtained an MRI and confirmed that the original ACL reconstruction surgery had failed.  *Id*.  The letter went on to say that "Ms. Myers job normally involves a fair amount of standing and walking" and that she "has been off of work secondary to the uncontrolled instability of her right knee in addition to hypertension and other medical issues which have precluded her from returning to work."  *Id*.  Finally, Dr. Collins noted that following surgery, "it is anticipated that she will be off work for a minimum of four weeks.  At that time she could probably resume light duty, in a sitting capacity without extended walking or standing.  The earliest that I envision her returning to a job that involves a fair amount of standing or walking will be two months from the surgery."  *Id*.  Dr. Collins performed Myers' ACL reconstruction surgery on May 12, 2006.  Pl. SOF ¶ 16.

After the STD period ended, Myers was approved for LTD benefits effective May 14, 2006.  Pl. SOF ¶ 40.  She was awarded a monthly benefit in the amount of $3,659.00.  *Id*.  On or about May 17, 2006,  LINA began investigating Myers' claim for LTD benefits by, *inter alia*, requesting medical records from Dr. Collins and Dr. Pavlatos and forwarding forms to Plaintiff for completion.  Def. SOF ¶ 19.

In a treatment note, dated June 7, 2006, Dr. Collins stated he did not think Plaintiff would be able to return to the activities of her job as described by her employer for three months from the time of surgery.  Def. SOF ¶ 21; Pl. SOF ¶ 19.  However, Dr. Collins also wrote a letter on June 7, 2006 to Mr. Provenzano updating Myers' status.  Pl. SOF ¶ 18; Def. SOF ¶ 21.  He noted that Myers was attending physical therapy three times a week, which he anticipated would continue for another three months.  Pl. SOF ¶ 18.  Dr. Collins also stated that Plaintiff still was having discomfort, pain and swelling in the right knee.  *Id*.  However, he allowed Myers, at her

request, to return to work effective June 12, 2006, if she was able to procure transportation. *Id.*; Def. SOF ¶ 21. If she did return to work, he recommended a sitting job that would permit Myers to elevate her leg. *Id.* The earliest that Dr. Collins envisioned Myers returning to a job that involved walking or standing, in a limited capacity, would be around July 12, 2006. *Id.* He also stated Myers "would not be able to meet the physical and mental requirements of her normal job for at least 4-6 months from the date of surgery." Pl. SOF ¶ 18. Dr. Collins concluded that he was unable at that time to state with any degree of medical certainty whether or not Myers would end up with permanent restrictions and/or disabilities as a result of her condition. Def. SOF ¶ 22.

A medical record, dated June 12, 2006 from Dr. Salazar included the line, "Diagnoses difficulty [sic] walking, headache, insomnia." Pl. SOF ¶ 21. On June 19, 2006, Dr. Pavlatos completed a LINA medical request form. Pl. SOF ¶ 20; Def. SOF ¶ 23. It stated that Plaintiff's recurrent right knee injury with ACL tear was preventing her from returning to work and the instability in the same knee was a factor impacting return to work. *Id.* The treatment plan included surgery "if patient chooses." *Id.* Dr. Pavlatos placed the following work restriction: "No work above ground level, work on level surfaces, brace to R [right] knee if knee is unstable." *Id.*

A LINA claim staffing form dated June 26, 2006 reflected a notation that Myers' occupational requirements were "light" and that LTD benefits were "ok to approve for now." Def. SOF ¶ 24. LINA then referred the file to its vocational rehabilitation unit. *Id.*

On July 3, 2006, Myers filled out a form for LINA in which she stated that she could not work in her own or any occupation because "I cannot walk or stand for more than a few minutes without experiencing severe pain in my right knee." Pl. SOF ¶ 22. In the same form, when asked if she had to use special equipment, she listed "crutches, shower chair, hand shower." *Id.*

Dr. Collins saw Myers on July 5, 2006. Pl. SOF ¶ 23; Def. SOF ¶ 25. Dr. Collins' noted: "She is now getting around without crutches"; "She still has a fair amount of pain and inflammation along the medial aspect of the knee. The knee feels stable."; "Exam today shows remarkably no effusion, but there is swelling over the anteromedial aspect of the knee at the point of the washer-lock-washer and tibial tunnel. There is minimal swelling or fullness laterally. Lachmans is negative. Anterior/posterior drawer and pivots are negative. She has good quad set and tone."; "I think that Sally is doing very well now status post ACL reconstruction, right knee."; "I think she can go back to working on her feet, although not continuously. She should avoid any impact activities but can do light walking and closed-chain exercises including cycling and swimming."; "She has tenderness and inflammation at the tibial tunnel site. I bone grafted this area and also she has a large washer-lock-washer. If this continues to be problematic we can remove it but I would wait another 3-4 months before removing hardware to allow the graft to heal."; "She is doing well enough now that I think we can transition her to a program primarily on her own for therapy. She will go to therapy once a week and then workout at the health club on her own the other days." *Id*.

On July 8, 2006 LINA's Vocational and Rehabilitation Department provided the Dictionary of Occupational Titles ("DOT") Definition No. 187.117-010 "Administrator, Health Care Facility, a light duty profession." Def. SOF ¶ 26. That job requires "Lifting, Carrying, Pushing, Pulling 20 lbs. occasionally, frequently up to 10 lbs., or negligible amount constantly. Can include walking or standing frequently even though weight is negligible. Can include pushing and or pulling of arm and or leg controls." *Id*. ¶ 27. The work situations listed under that definition include "Performing a Variety of Duties; Directing, Controlling, or Planning

Activities of Others; Dealing with People (Beyond receiving work instruction); Making Judgments and Decisions." *Id.* ¶ 28.

On July 12, 2006, Dr. Salazar diagnosed Myers with anxiety, panic, insomnia, and hormonal imbalance and noted that he would consider adding welbutrin if her fatigue continued to her next visit in four weeks. Pl. SOF ¶ 24. Myers was treated by Dr. Salazar on a near monthly basis from May 2006 to March 2007 for a variety of conditions. *Id.*

Also on July 12, 2006, Myers talked to a LINA vocational rehabilitation counselor ("VRC"). Pl. SOF ¶ 25. In that conversation, Myers noted that her return to work date had been extended three months, that she was unable to walk without assistance of a cane, and that she had a lot of pain and swelling. *Id.* The VRC commented that "barriers preventing return to work at this time are walking, standing, etc." *Id.*

On July 17, 2006 LINA approved Plaintiff's claim for LTD benefits as of May 14, 2006. Def. SOF ¶ 29. On August 8, 2006 Myers visited Dr. Collins. Pl. SOF ¶ 26. The report from that visit notes that Myers "thinks the hardware is bothering her and was hoping we could remove it"; and there was "some popping and pain laterally and she suspects that the bone mulch screw could be bothering her." *Id.*

On September 6, 2006, LINA terminated Plaintiff's LTD claim effective August 3, 2006. Def. SOF ¶ 30; Pl. SOF ¶ 41. In the letter to Plaintiff describing the basis for its decision, LINA stated: "We recently completed a review of the information on file. Specifically, this included: -- An office progress note dated June 7, 2006 from Roger Collins. He states you are doing fairly well status post anterior cruciate ligament reconstruction of May 12, 2006. Stability seems good. He states based on the requirements of the job, you would be able to return to your work activities three months from your surgery date. – An office visit dated July 5, 2006 also from Dr.

Collins, indicates that you are progressing well and have no knee instability. He states that you could go back to working on your feet, although not continuously. We discussed your claim with one of our Nurse Case Managers. Based on that discussion/review, we have determined that we do not have medical to support your inability to perform your occupation." *Id*.

Myers saw Dr. Salazar on September 27, 2006. Pl. SOF ¶ 28. His notes indicate that she "has signs and symptoms like depression and anxiety though its similar to what saw on the web for signs and symptoms" and "paxil really seemed to helped at first and now seems to have plateaued." *Id*. Plaintiff saw Dr. Salazar twice in October of 2006. *Id*. ¶ 30. On October 12, 2006, Myers complained of pain and paresthesia in her left arm that extended to her hand and left side of her head. *Id*. On October 18, 2006 Dr. Salazar diagnosed Myers with chest pain, anxiety, shortness of breath, insomnia and knee pain. *Id*.

On October 12, 2006, family practitioner Francis Vincent, MD completed a Physical Residual Functional Capacity Assessment for the Social Security Administration for 12 months after alleged onset of disability on February 13, 2006. Def. SOF ¶ 31. Dr. Vincent projected that by February 13, 2007, Plaintiff would be able to occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand and/or walk abut six hours in a 8-hour workday, sit about 6 hours in an 8-hour workday and push and/or pull unlimited. *Id*.

In an October 16, 2006 treatment, Dr. Collins noted that it was reasonable to proceed with Myers' hardware removal, "given the fact that she is fairly disabled." Pl. SOF ¶ 31. On that same date, Dr. Collins filled out a Physical Ability Assessment Form for LINA. Def. SOF ¶ 32. In that form, he checked boxed indicating that Myers could sit continuously (over 5.5 hrs.) and occasionally (less than 2.5 hrs.) stand, walk, and reach (overhead, at desk level and below the waist). *Id*. Dr. Collins also indicated that Myers could occasionally lift and carry 10 lbs. *Id*.

The checklist also indicates that she could not balance, stoop, kneel, crouch, or crawl. Pl. SOF ¶ 46. The report concluded "continued pain – light duty/office work – (will schedule surgery hardware removal ASAP)." *Id*.

On November 21, 2006 LINA contacted Dr. Collins office. Def. SOF ¶ 33. The LINA representative did not talk to Dr. Collins, but did talk with someone from his office who "confirmed that per the PAA form, patient can work light duty/office work. Claimant does have continued pain, but she can work with the pain." *Id*.[5]

On December 4, 2006, Plaintiff underwent a Functional Capacity Evaluation ("FCE") Physical Work Performance Evaluation upon her own request. Def. SOF ¶ 34.[6] The "Overall Level of Work" for comparison was "Light. (Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exist 2/3 or more of the time.) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may only be a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting can be and is physically demanding of a worker even though the amount of force exerted is negligible.) *Please note that the overall level*

_____

[5] Plaintiff has objected to the inclusion of this statement on hearsay grounds. The Court tends to agree but because this statement of fact does not impact the resolution of the motions, the parties can provide further argument prior to or at trial.

[6] An FCE is an evaluation conducted by an independent physician evaluator, and it a battery of physical tests that assess whether an injured employee is able to return to work and in what capacity. See *Goetzke v. Ferro Corp.*, 280 F.3d 766, 770 (7th Cir. 2002).

*of work is merely a guideline. If accommodations are made, consistent with the client's abilities noted in the tasks performance table, higher levels of work may be possible.*" *Id.*

The FCE recommendation was that "based on the evaluation, the client is capable of sustaining the Light level of work for an 8-hour day. Mrs. Myers was able to complete the evaluation." Def. SOF ¶ 34. However, the report stated that "[t]he discrepancy between job/occupational demands and client's abilities is significant, making prognosis for return to work guarded." *Id.* The FCE also identified "Factors underlying Functional Limitations": "1. Decreased muscle strength in lower extremity. 2. Decreased range of motion in the right knee due to pain limiting functional flexion. 3. Generalized de-conditioning. 4. Pain in the right knee during weight bearing activities when either directly on the knee or while standing. During positional testing this led to significant compensatory motions increasing trunk rotation and pelvic hike which potentially increases stress to the lower back. 5. Inability to achieve normal positioning for appropriate lifting mechanics due to pain and loss of functional flexion in weight bearing." *Id.* The same report noted that Myers' job match, based on a job demand description provide by Myers, indicated she could not meet 72% of the job demands. *Id.*

On December 5, 2006, LINA performed a Transferable Skills Analysis pertaining to Plaintiff's Waiver of Premium ("WOP") claim using Dr. Collins' Physical Abilities Assessment dated October 16, 2006. Def. SOF ¶ 35. LINA identified three sedentary occupations which Plaintiff could perform with her medical restrictions and limitations: Director, Community Health; Director, Nursing Service; and Cardiac Monitor Tech. *Id.* On that same date, LINA denied Plaintiff's WOP claim, explaining that "[w]e reviewed your claim file as a whole and based our decision on policy language and all the documents contained in your file, including the following specific information: -- Medical records from Dr. Collins, dated June 7, 2006 in which

he stated you were doing fairly well status post anterior cruciate ligament reconstruction. Stability seems good. Six weeks from surgery will be 6/22/06. It will be at that time that we will allow full weight bearing. He also states that based on the requirements of your job, you would be able to return to your work activities three months from your surgery date. If she were able to get a ride to work should simply do a purely sitting job, but could not be walking about. – Medical records from Dr. Roger Collins, dated July 5, 2006 in which he stated you were now getting around without crutches. The knee feels stable. He states that you are doing very well and could go back to working on your feet, although not continuously. He further stated that you should avoid any impact activities, but can do light walking and closed-chain exercises including cycling and swimming. – A Physical Abilities Assessment, dated 10/16/2006 in which he marked you could continuously sit, and occasionally stand, walk, and reach for an 8 hour workday. His notes indicated you have continued pain, but could perform light duty/office work. Based upon your completed Disability Questionnaire, you noted that you completed 2-years of college with an Associate of Applied Science/RN degree. You also noted that you worked as a Community Manager from August 8, 2001 to June 12, 2006, a Nursing Home Administrator from 1994 to 2001, and a Nursing/Nursing Manager from 1984 to 1994. In this respect, we referred your file to a Certified Vocational Rehabilitation Counselor who reviewed a summary of your training, education and work experience as well as your medical information and restrictions. With this information, sedentary duty job levels were identified that you could perform based on your current functional abilities. The following jobs were identified: -- Director, Community Health, -- Director, Nursing Service, -- Cardiac Monitor Tech." *Id.* ¶ 36.

Dr. Collins performed the surgery to remove the hardware (screw and washer) in Myers' proximal right tibia on December 8, 2006. Pl. SOF ¶ 33. On January 12, 2007, Dr. Salazar

evaluated Myers.  Pl. SOF ¶ 34.  In that evaluation he noted that she had "pain in lateral aspect of right lower extremity" which is "burning in nature."  *Id*.  He also "discussed reflex sympathetic dystrophy which patient is curious about" although he noted that it is "very difficult to make that diagnosis."  *Id*.  He then diagnosed Myers with pain syndrome, headache, insomnia, and nervous movement disorder (oral and left hand).  *Id*.

On January 15, 2007, Myers appealed LINA's termination of her LTD benefits as of August 3, 2006 and its denial of her WOP claim.  Def. SOF ¶ 37; Pl. SOF ¶ 43.  The appeal letter referenced evidence supporting a finding of LTD, including[7]: (i) Dr. Collins' notes from June 7, 2006 in which he "found increased pain and swelling, with a problematic subcutaneous hemorrhage"; noted her job description included the ability to push, pull or lift up to 30 pounds, the ability to bend or kneel up to 15 consecutive minutes, and the ability to work 3 to 3.75 hours standing, walking or moving without the need to sit down"; and thus found she could not return to his job for at least three months after surgery; (ii) Dr. Collins July 5, 2006 treatment note which indicated that Plaintiff still had a fair amount of pain and inflammation and although she could begin working on her feet, she could not stand continuously and must avoid all impact activities.; (iii) a work history report for Myers' Social Security disability application stating that her previous work required standing at least six hours per day and that her own occupation required stooping and crouching for 1-2 hours per day, frequently lifting 50 or more pounds and pushing people in wheelchairs; (iv) her complaints of pain to Dr. Collins on August 8, 2006 related to the hardware installed during the May 2006 surgery; (v) Dr. Collins' recommendation of September 5, 2006 that Myers would not go back to her previous job, without additional

---

[7] Pl. SOF ¶ 43 claims to include evidence cited in Plaintiff's appeal letter.  Some of the statements were made not in the letter but in the underlying reports and notations.  Those statements will not be included for Pl. SOF ¶ 43.  The distinction may ultimately be irrelevant because, as discussed below, the Court's review is *de novo* in regard to the LTD benefits and therefore the Court can examine any evidence contained in the administrative record.

surgery; (vi) Myers' statements included in an Activities of Daily Living Questionnaire that she had constant, burning pain in her right knee which radiates down to her ankle and up her thigh and that the pain was so severe that it disrupted her concentration to the point that she could not read and had difficulty sorting and filling out simple forms; (vii) Dr. Collins' notes from October 16, 2006 that Myers' condition had deteriorated and that additional surgery to remove the hardware may relieve some of the pain but it was unlikely to fix her neurogenic complaints; (viii) the FCE on December 4, 2006, which noted the factors underlying her limitations, indicated Myers could not compete 72% of the required activities of her previous occupation, and noted she completed the testing with no inconsistencies and minimal self-limiting. Pl. SOF ¶ 43.

Myers saw Dr. Collins on February 20, 2007 for a follow-up evaluation after her hardware removal surgery. Pl. SOF ¶ 35. Dr. Collins noted that he performed ACL reconstruction on Myers on May 12, 2006, after which she experienced flare-up, tenderness and persistent pain, which prompted him to schedule her knee hardware removal (washer-lock-washer and screw) on December 8, 2006. *Id.* Dr. Collins found Myers had a progressively enlarging causalgia type presentation although her knee was stable. *Id.* Dr. Collins referred her to Dr. Anatoly Arber for diagnosis and treatment of her complaints. *Id.*

On February 28, 2007 LINA referred the file for an internal file review by a Nurse Case Manager and a Medical Director, providing the following specific assessment questions: "1. Does new medical records refute the previous decision?; 2. Does new medical records support R/L [restrictions/limitations] from 8/3/06 through present to preclude light work abilities?; 3. Does new medical records support R/L from 12/5/06 through present to preclude sedentary work abilities?" Def. SOF ¶ 38. On March 5, 2007, Medical Director John Mendez, MD and Jo Jacobson, R.N., C.C.M. provided the following report and answers to the three questions:

"Medical Records reviewed include, but are not limited to – 12/4/06 Physical work Performance Evaluation Summary. Right knee pain following ACL reconstruction. Able to tolerate light work on an eight-hour day. Self-limiting behavior was minimal." Def. SOF ¶ 39; Pl. SOF ¶ 44. The answers provided were: "1. No. This is because there is no current documentation of any significant physical, cognitive or psychological limitations and/or significant clinically measured functional deficits in those areas. As the FCE report dated 12/4/06 validates, she is capable of performing light work duties, consistent with her work duties. 2. No. See answer above for rationale. 3. No. See answer above." Def. SOF ¶ 39. The review evaluated Myers' "Community Manager" job as "light per DOT." Pl. SOF ¶ 44. Included in the Appeal File Review was a Reason for Denial which stated: "Medical did not support l/r precluding his occ and on WOP, PAA showed cx could do sedentary." *Id.*

On March 8, 2007, LINA upheld its initial termination of Plaintiff's claim for LTD benefits and its denial of Plaintiff's claim for WOP, reasoning as follows: "Overview of Eligibility of Benefits – We based our decision on Ms. Myers' claim for benefits upon Policy language and all documents contained in her claim file, viewed as a whole. I am aware that Ms. Myers has been off work since February 13, 2006 due to a torn ACL of the right knee. As stated to you in our letter of February 28, 2007, we conducted a medical review. As part of her review, our medical director reviewed the medical information in your Long Term Disability and Waiver of Premium Claim file. After review of the medical records contained in your claim file, our medical director stated that the medical documentation in file does not support limitations and/or restrictions that would preclude Ms. Myers from performing the duties of her occupation as a Community manager from August 3, 2006 forward. Our medical director said that there is no current documentation of any significant physical limitations and/or significant clinically

measured functional deficits to preclude Ms. Myers from performing her or any occupation. Per the Functional Capacity Evaluation of December 4, 2006, Ms. Myers is capable of performing her occupation. Summary – Mr. Debofsky, the plan provides that Life Insurance Company of North America would pay Long Term Disability benefits only if Ms. Myers met the plan's requirements, including the definition of Disability. Life Insurance Premiums would be waived if Ms. Myers were prevented by Disability from performing the duties of any occupation. Disability is determined by medically supported limitations and restrictions which would preclude Ms. Myers from performing the duties of her or any occupation. We do not dispute Ms. Myers may have been somewhat limited or restricted due to her subsequent diagnoses and treatment; however, an explanation of Ms. Myers' functionality and how her functional capacity prevented Ms. Myers from continuously performing the material duties of her occupation beyond August 3, 2006 and her or any occupation beyond December 5, 2006 was not clinically supported. The presence of a condition, diagnosis or treatment does not necessarily equate to a presence of a disabling condition or decreased level of functionality. The Transferable Skills Analysis of November 30, 2006 remains valid. As such, we are affirming our previous Long Term Disability denial of September 6, 2006 and our Waiver of Premium denial of December 5, 2006 within the meaning and terms of Ms. Myers' group Long Term Disability and group Life Insurance plan." Def. SOF ¶ 40; Pl. SOF ¶ 45.

Dr. Salazar's final evaluation of Myers took place on March 9, 2007 and noted her pain syndrome/reflex sympathetic dystrophy continues. It further stated that Dr. Arber was planning to conduct a "nerve block procedure for her right lower extremity paresthesia." Pl. SOF ¶ 36. Myers visited Dr. Arber on March 16, 2007 for her right knee pain and he diagnosed her with

Complex Regional Pain Syndrome ("CRPS").[8]  Pl. SOF ¶ 37.  Myers' patient questionnaire stated that standing, walking, lifting, and physical activity made her pain worse.  *Id*.  She described the pain as moderate throbbing, mild shooting, severe stabbing, severe sharp, moderate cramping, severe hot-burning, severe aching, severe tenderness, severe fearful, mild heaviness, mildly tiring, and mildly sickening.  *Id*.  Myers again saw Dr. Arber on April 10, 2007, at which time he diagnosed her with CRPS Type 1 of the lower extremity, and performed right lumbar sympathetic block procedures for her persistent neuropathic pain.  *Id*. ¶ 38.

On September 18, 2007, Myers submitted a final appeal of the termination of her LTD benefits as of August 3, 2006 and the denial of her WOP claim.  Pl. SOF ¶ 46; Def. SOF ¶ 41.  The final appeal included the following evidence in support of Myers' disability: (i) the Physical Ability Assessment Dr. Collins performed on October 16, 2006; (ii) a job description of Myers' "Community Manager" position which included the physical requirements[9] (iii) a claim direction staffing form the nurse claim manager reviewing Myers' claim for transition from STD to LTD stated "EE is medium occ [occupation]" and "based on post-op guidelines medical supports R/L [restrictions and limitations] which precludes EE RTW [employee return to work] period to LTD 5/13/06"; (iv) a July 10, 2006 CIGNA claim file note stated Myers' occupation appears to be "medium duty" per her job description and "light duty" per national economy; (v) a Vocational Assessment performed by James J. Radke, MS, CRC, LCPC on August 29, 2007.  Radke evaluated Myers' medical documentation, the December FCE, and the requirements of her occupation as a "Community Manager" at Belmont Village. Radke stated that Myers' job required greater physical exertion than the DOT description including more walking than "a typical light job" and moving of furniture.  Radke noted that the FCE indicated Myers was

[8] Allegedly synonymous with Reflex Sympathetic Dystrophy Syndrome.

[9] The requirements were the same as noted in the first appeal.

capable of performing the occupation of "Manager of Housing Project," but that this DOT job description was entirely inconsistent with the "Community Manager" job description provided by Myers' employer. Radke also noted that Dr. Collins' restrictions from October 16, 2006 were consistent with the definition of "sedentary" not "light" work, because by definition "light" work requires frequent standing and walking, which is more than Plaintiff was capable of performing. Radke noted Myers' job requirements included: ability to push, pull and lift up to 30 pounds, ability to kneel and bend up to 15 consecutive minutes, ability to work 3 – 3¾ hours standing, walking or moving without the need to sit down, and 1½ - 2 hours sitting in the office doing administrative tasks. Thus, Radke concluded Myers' "own occupation" was somewhere between light and medium exertion, while her physical restrictions limited her to a sedentary job. Radke also pointed out that Plaintiff's job included responsibility for daily occupation of the community and supervisions of all employees; (vi) Radke also conducted reasoning tests which showed "a great deal of difficulty doing reasoning tasks when compared to others in similar positions. She attempted approximately one half of the questions in both tests indicating that her processing speed could be somewhat reduced at this point." Radke concluded that Myers was "clearly disabled from doing her job as indicated in the job description"; (vii) Myers also requested in her appeal letter the opportunity to review and comment on any evidence obtained by CIGNA prior to the conclusion of the appeal. Pl. SOF ¶ 46.

On October 19, 2007, LINA referred the file to an internal vocational counselor to conduct an occupational review and identify the appropriate DOT definition for Myers' occupation. Def. SOF ¶ 43. On October 22, 2007, Sandra Wolk Schimizzi, MED, LPC, CRC, CCM confirmed that the appropriate definition was DOT 187.117-010, Administrator, Health Care Facility (medical services). *Id.* On October 23, 2007, LINA referred the file to Intracorp

for the review by an independent physician who specialized in Physical Medicine and Rehabilitation with a specialty in Pain Medicine.  Def. SOF ¶ 44.  LINA provided specific instructions, including for the [independent] physician to review the medical information submitted, to interview the attending physicians, and to respond to three specific review questions posed.  *Id.*  On November 14, 2007 Ephraim K. Brenman, DO, conducted that file review of Myers' claim.  Pl. SOF ¶ 48; Def. SOF ¶ 45.  The report submitted by Dr. Brenman described having contacted Dr. Collins and Dr. Salazar's offices to no avail and without return phone calls from either.  Def. SOF ¶ 45.  Dr. Brenman further contacted Dr. Arber who stated that he last saw Plaintiff on September 18, 2007 and therefore could not make a judgment on Plaintiff's ability to work or her functional status.  *Id.*  Dr. Brenman noted in his report that Dr. Arber diagnosed Myers with CRPS on April 10, 2007, that Mr. Radke found Myers could work only sedentary level jobs and that Myers worked at an administrative healthcare facility, which is light work, required sitting and standing for prolonged periods of time, and some walking.  Pl. SOF ¶ 48.

Dr. Brenman did provide in the report the following answers to the following questions presented to him:

1.  *Please review the medical information sent to you and comment whether the Restrictions and Limitations are supported or not in the documentation provided for review from 8/4/06 through present.*  No.  The medical information sent and the Restrictions and Limitations are not supported in the documentation provided for review from 8/4/06 through present.  The patient can work at a light physical demand level as according to the requirements of an administrator of healthcare facility.  The patient has full range of motion with subjective pain.  There are no findings consistent with CRPS on examination.  There is no documentation to support the restrictions that are put forth from 8/4/06 through present.

2.  *List the documents provided for review, identifying provider and date of the service provided.  Include a beginning comment that the opinions reached are based on the documents provided and available to review and any telephonic conversations with the*

> *Attending Physician.* The opinions reached are based on the documents provided and available to review. I was only able to contact Dr. Arber, who cannot comment.

> 3. *If you find the available information conflicting or if you disagree with the attending provider (AP), please contact the claimant's AP's. Please discuss with the Attending Physician your conclusion as well as any conflicting medical information, and include a summarizing of this conversation in your report. Please Explain.* See contact with attending physician above.

Def. SOF ¶ 46. The report was not signed by Dr. Brenman, nor did he ever examine Myers. Pl. SOF ¶ 48.

A claim file note dated November 6, 2007, states that Myers' attorney requested a copy of the Independent Peer Review. Pl. SOF ¶ 49. On November 20, 2007, Myers submitted a letter to CIGNA specifically requesting a copy of the Independent Peer Review conducted by Dr. Brenman for review and comment prior to the issuance of the decision. Pl. SOF ¶50. CIGNA did not provide a copy of Dr. Brenman's report before affirming denial of Myers' benefits in a letter dated November 30, 2007. Pl. SOF ¶ 51; Def. SOF ¶ 47. The letter stated that the denial decision was final and that no further appeals would be granted. Pl. SOF ¶ 51. The letter stated "To clarify the duties of Ms. Myers' occupation as it is normally performed in the general labor market, we conducted a vocational assessment. The Rehabilitation Counselor performing the review took into consideration, Ms. Myers' job description of Community Manager, the information provided by Security Capital, the DOT 187.117-010 Administrator, Health Care Facility, the summary Report by James Radke dated August 29, 2007, Dictionary of Occupational Titles, O*Net, and the Disability Questionnaire completed by your client on July 3, 2006. Based upon the review of the above information, it was determined that the appropriate DOT for Ms. Myers 'regular occupation' corresponds to DOT 187.117-010 ADMINISTRATOR, HEALTH CARE FACILITY (medical services). All medical evidence on file was referred for

an Independent Peer Review by a Physician Board Certified in Physical Medicine and Rehabilitation.  Per your request we included a copy of the report.  Based on the results of the Independent Peer Review Ms. Myers is able to perform at a light physical demand level."  Def. SOF ¶ 47.

After the final denial was communicated to Myers, Plaintiff filed the instant lawsuit.  Pl. SOF ¶ 52; Def. SOF ¶ 48.  In addition to her claim for benefits submitted to LINA, Myers concurrently applied for social security benefits.  Def. SOF ¶ 42; Pl. SOF ¶ 47.  Myers completed a Disability Report for a Social Security Disability benefits application on October 27, 2006.  Pl. SOF ¶ 29.  In that report she noted that she began experiencing increased pain and burning in her knee around September 2006 or October 2006, and that this pain decreased her mental clarity and caused difficulty with her activities of daily living.  *Id.*  Myers' claim was presented for hearing before Administrative Law Judge Lovert F. Bassett on September 27, 2007.  Def. SOF ¶ 42.  The Social Security Administration ("SSA") approved Myers' application on October 26, 2007 finding her disabled as of February 13, 2006.  Pl. SOF ¶ 47.  The SSA found Myers' right knee impairment so severe that it met the requirement for a listed impairment.  *Id.*  The SSA thus awarded Myers benefits in the amount of $1,930.00 per month.  *Id.*

## III.    Standard of Review

### A.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party."  *Foley v. City of*

*Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004). "When, as here, cross-motions for summary judgment are filed, we look to the burden of proof that each party would bear on an issue at trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). For claims seeking benefits under an ERISA plan "at trial the plaintiffs would bear the burden of proving [the beneficiary's] entitlement to the benefits of the insurance coverage, and the defendant [insurer] would bear the burden of establishing [the beneficiary's] lack of entitlement * * *." *Id.*

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

### B.      ERISA Standard of Review

Myers seeks review of LINA's termination of her long-term disability benefits and its denial of her request for a waiver of life insurance premiums. The default standard for reviewing a denial of benefits challenged under Section 1132(a)(1)(B) is *de novo*. See *Firestone Tire and*

*Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, a court may apply the more deferential "arbitrary and capricious" standard of review if the plan documents creating the relationship give "the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115. Because the LTD Policy and the Life Policy contain different language, Myers' requests will be evaluated under separate standards. The parties agree that the LTD Policy lacks the necessary discretionary language. Accordingly, the Court will undertake *de novo* review of the LTD determination. See *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 330 (7th Cir. 2000). The parties also agree that the Life Policy does include language conferring discretion on the administrator; thus, the Court will review LINA's denial of the life insurance premium waiver under the discretionary standard.

## IV.    Analysis

### A.    Waiver of Life Insurance Premiums

Reviewed under an arbitrary and capricious standard, LINA's decision to deny waiver of premiums is entitled to "great deference." See *Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 991 (7th Cir. 2005) (citation omitted). Disagreement with the insurer's decision to deny benefits is insufficient to overturn that decision. Rather, to justify a judicial intervention, the decision must be "downright unreasonable." See *id.* However, the Court's application of the deferential standard of review is tempered somewhat where, as here, a potential conflict of interest may exist because the insurer both pays and administers claims. See *Metro. Life Ins .Co. v. Glenn*, 128 S.Ct. 2343, 2350 (2008).

In order to be eligible for a WOP, Myers must have been unable to perform all of the material duties of any occupation for which she was reasonably qualified based on her education, training or experience. Under that standard, LINA's decision to deny Myers' WOP claim cannot

be termed an abuse of discretion, even with a thumb placed gently on Myers' side of the scale in view of LINA's dual role as payor and administrator.

In initially denying Myers' WOP claim, LINA determined that at the very least she could meet the requirements of a sedentary occupation. That determination rested on several factors, including the opinion of Myers' own treating physician, who concluded that Myers could perform "light duty/office work." Using that standard, LINA performed a Transferable Skills Analysis, and, referring the file to a Certified VRC, identified three sedentary occupations that Plaintiff could perform that were consistent with her training, education and work experience: (i) Director, Community Health, (ii) Director, Nursing Services, and (iii) Cardiac Monitor Tech. Myers challenges LINA's determination that she was physically capable of meeting the sedentary standard.[10]

Myers contends that LINA employed selective review in reaching its decision that she could meet sedentary physical requirements. As discussed below, there may be a question whether the "light duty/office work" term used by Dr. Collins is coextensive with the "light duty" term applicable under the DOT definitions. However, there is no question that "light duty/office work" requires the same, if not more, physical capabilities that are required of a sedentary position. Information that became available to LINA only after its initial decision to deny Myers' WOP claim further precludes a finding of arbitrary and capricious. The FCE recommended that Myers was capable of sustaining light level work for an 8 hour day.

The only evidence to which Myers has pointed in support of her contention that she could not perform sedentary work is the Social Security Administration's ("SSA") findings and conclusions. That evidence alone does not persuade the Court that LINA's determination was arbitrary and capricious. To begin with, a plan administrator need not defer to SSA

---

[10] Myers apparently concedes the occupations chosen by LINA are otherwise suitable.

determinations unless the plan specifically requires that deference be given. See *Tegtmeier v. Midwest Operating Eng'gs Pension Trust Fund*, 390 F.3d 1040, 1046 (7th Cir. 2004) ("While Social Security decision, if available, are instructive, these determinations are not dispositive (except in those cases where a plan ties benefits to the Social Security decision * * *)"); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823 (2003) (distinguishing disability determinations by the SSA that are measured against a "uniform set of federal criteria" from ERISA disability determinations that turn on "interpretation of terms in the plan at issue"). To the extent that Plaintiff also points to notes from Drs. Arber and Salazar that she had continued pain in her knee, the Court finds that evidence insufficient to overturn the WOP ruling, because neither doctor indicated how that pain would prevent Myers from performing sedentary work.

In sum, because the Plan does not require LINA to follow the SSA decision and there is no evidence indicating Myers could not perform sedentary work, LINA's WOP determination was not an abuse of discretion. LINA's motion for summary judgment is therefore granted as to its denial of Myers' WOP claim, and Myers' cross-motion for summary judgment on that same claim accordingly is denied.

### B.    Long-Term Disability Benefits

LINA's decision to terminate LTD benefits will be reviewed under the *de novo* standard. As the Seventh Circuit has pointed out, district courts are not actually *reviewing* anything under that standard. See *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007). Rather, the district court's task is to make an independent decision about the employee's entitlement to benefits on both the legal and factual issues that form the basis of the claim. *Id*. It therefore is irrelevant whether LINA provided a full and fair hearing or selectively reviewed the evidence. At the same time, however, at this stage of the case the Court's independent analysis must be

made within the summary judgment framework. Thus, the Court may not weigh evidence or engage in fact finding. See *Marantz v. Permanente Med. Group Inc. Long Term Disability Plan*, 2008 WL 516712, at *4 (N.D. Ill. Feb. 21, 2008).

### 1.      First 24 Months

An individual is Disabled under the Plan for the first 24 months, and thus eligible for LTD benefits, if he or she is "unable to perform all the material duties of his or her regular occupation." "Regular Occupation" is defined under the Plan as "the occupation you routinely perform at the time the Disability begins. In evaluating the Disability, we will consider the duties of the occupation as it normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location." The parties disagree on the proper scope and application of the term "regular occupation." Myers contends that any construction of that term requires consideration of the actual job that she held and the tasks that she performed at Belmont Village. LINA submits that the definition provided by the United States Department of Labor in the *Dictionary of Occupational Titles* ("DOT") for an "Administrator, Health Care Facility" is the best standard for comparison.

Applying the clear language in the Plan defining "regular occupation," the Court respectfully must reject Plaintiff's position. The Court also rejects Plaintiff's contention that because LINA originally acknowledged that "her occupation" should be evaluated at "medium," LINA is estopped from altering that classification. That argument obscures the difference between disability standards for short-term disability ("STD") and LTD benefits. Under the Plan, an STD evaluation asks whether the claimant can perform all the material duties of his or her "*own* occupation," while an LTD evaluation employs the "regular occupation" standard set

forth above. Plaintiff was granted STD disability benefits when LINA determined that she was disabled from her "own occupation." When Plaintiff's STD benefits expired, her eligibility for continued benefits under the LTD Policy required analysis under the "regular occupation" definition. At that time, LINA requested "regular occupation" review, resulting in a change in classification from "medium" to "light." LINA is free to alter a claimants' status when the scope of comparison changes under the clear language of the Plan.

Yet rejection of Plaintiff's initial argument does not inevitably lead to the Court's acceptance of LINA's position. Even if the Court accepts LINA's position that use of DOT definitions in this context generally are preferable, the question remains whether the precise DOT occupation chosen by LINA encapsulates Myers' occupation as it is normally performed in the general labor market in the national economy.

But Myers does not argue that LINA chose the wrong DOT definition or that a different DOT definition comes closer to capturing the essence of Myers job in the national economy. The litany of cases cited by Plaintiff (most of which are outside of this Circuit and all of which lack pinpoint cites) simply do not apply to the situation confronting the Court. The glaring distinction between the facts of the cases on which Plaintiff relies and the circumstances of this case is the presence of a specific definition of "regular occupation" in the Plan at issue here. See, e.g., *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) ("The term 'regular occupation' is not defined by the Policy itself"); *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 385 (3d. Cir. 2003) ("we first determine what is his 'regular occupation,' as the Policy leaves this term undefined"); *Ebert v. Reliance Standard Life Ins. Co.*, 171 F. Supp. 2d 726, 735 (S.D. Ohio 2001); *McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998) (in addition to the absence of a definition of "regular occupation," the court was applying

Illinois state law in a non-ERISA context)  Notably, *Lasser* commented "it is unreasonable for [insurer] to define 'regular occupation' differently from its plain meaning * * * *without explicitly including that different definition in the Policy*."  344 F.3d at 386-387 (emphasis added).

Although LINA also largely relies on cases from other circuits, a few of LINA's cases provide at least some support for its position (although notably some of the decisions applied abuse of discretion review).  *Willis v. Baxter Int'l, Inc.*, 175 F. Supp. 2d 819, 822 (W.D.N.C. 2001), states that "generalized descriptions, usually excerpted from the Dictionary of Occupational Titles, are the preferred method of job description in disability cases."  However, *Willis* was decided on abuse of discretion review and ultimately stands for the proposition that the "reasonableness of a fiduciary's decision to resort to extracontractual points of reference, such as the DOT descriptions, in making a disability determination must be judged on a case-by-case basis."  *Id.* (quoting *Gallagher v. Reliance Standard Life Ins. Co.*, 171 F. Supp. 2d 594, 602 (W.D.N.C. 2001)).  *White v. HealthSouth Long-Term Disability Plan*, 320 F. Supp. 2d 811, (W.D. Ark. 2004) observed that while the Eighth Circuit had not confronted the issue, other circuits have found that the DOT may be used to provide an objectively reasonable job description for assessment of disability in ERISA case and concluded that use of a DOT description was not an abuse of discretion.  *Id.* at 819.  Perhaps more significantly, the applicable plan in *White* defined "regular occupation" – and in fact used the same definition as the LINA Plan.  *Id.*

In the absence of controlling Seventh Circuit precedent and in view of the authorities cited by the parties and in the Court's independent research, the Court concludes that LINA's reference to DOT definitions was proper in this case, particularly in light of the definition of "regular occupation" in the LTD Policy.  Construction of the term "regular occupation" requires

some kind of general definition that applies nationwide. The DOT definitions provide exactly that and without any alleged bias in the job descriptions or classifications. To be certain, the propriety of LINA's reliance on DOT definitions would be open and shut if LINA had referred specifically to the DOT as a proper point of reference in the Plan. Nonetheless, in the absence of any more plausible alternative suggested by Plaintiff, the Court finds use of the DOT materials appropriate.[11]

The Court still must determine whether the specific DOT definition for "Administrator, Health Care Facility (medical and health services manager)" is the proper standard. The term "regular occupation" would be meaningless without some consideration of the insured's actual job duties. If the DOT occupation is not appropriate, then the job comparison will be flawed. For example, if the insured was a machinist whose "regular occupation" required strenuous physical activities, it would be improper to classify him or her as a secretary and therefore conclude that he or she could meet sedentary physical requirements and deny disability benefits on that basis. See *e.g.*, *Ebert*, 171 F. Supp. 2d at 734 (the court found that "the DOT-specified occupation of Cardiopulmonary Technologist is not similar to Plaintiff's actual job as Cardiopulmonary Assistant"). LINA points out that Myers does not contest that the DOT occupation selected by LINA broadly describes her actual occupation and includes her duties in the general labor market. The Court nonetheless will compare the physical requirements and general duties of a "Community Manager" and an "Administrator, Health Care Facility."

The physical requirements of an "Administrator, Health Care Facility" defined as "light" include the following: "lifting, carrying, pushing, pulling 20 lbs. occasionally, frequently up to

---

[11] See also *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 645 (7th Cir. 2007) (although the insurer's use of the DOT definition was not contested by the claimant, the Seventh Circuit found nothing inherently improper with its application).

10 lbs., or negligible amount constantly. Can include walking and or standing frequently (between 1/3 and 2/3 of a workday) even though weight is negligible. Can include pushing and or pulling of arm and or leg controls." The physical requirements of a "Community Manager" are "ability to push, pull or lift up to 30 lbs., using proper body mechanics and/or available equipment. Ability to bend or kneel for up to 15 consecutive minutes. Ability to work for 3 to 3.75 hours standing, walking or moving without need to sit down." The only clear differences in the physical requirements of the two positions are (i) ability to manipulate 10 more pounds (although it is unclear how often that would be required); and (ii) the ability to bend or kneel.

Although the "Community Manager" position contains the two discrepancies noted above, those slight differences are not such that the work described rises above "light" to "medium" work. "Medium" work as defined under the DOT is "exerting 20 to 50 pounds of force occasionally, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical demand requirements are in excess of those for light work." The ability to manipulate 10 more pounds than required for "light" work, for an undefined frequency, does not otherwise elevate the "Community Manager" position to "medium." Plaintiff may have actually engaged in tasks beyond those listed for a "Community Manager" which resulted in LINA's classification of "medium" for her STD benefits. Tasks not listed in the position description will not be considered because, as discussed above, they are not relevant to her "regular occupation."

The "Community Manager" job summary is as follows: "Maintain daily operations of community. Supervise and direct work activity of employees. Create and maintain high level of resident and employee satisfaction." The "Administrator, Health Care Facility" position "directs administration of hospital, nursing home, or other health care facility within authority of governing board; administers fiscal operations, such as budget planning, accounting, and

establishing rates for health care services; direct hiring and training of personnel; negotiates for improvement of and additions to buildings and equipment; directs and coordinates activities of medical, nursing, and administrative staffs and services; develops policies and procedures for various establishment activities; may represent establishment at community meetings and promote programs through various news media; may develop or expand programs or services for scientific research, preventive medicine, medical and vocational rehabilitation, and community health and welfare promotion." It is apparent from these admittedly generic summaries that both positions are not physically active jobs; they require supervision and organization. There is nothing contained in one summary that would lead this Court to determine that they are inapplicable.

The physical requirements and job summaries of "Community Manager" and "Administrator, Health Care Facility" are very similar. Importantly, Plaintiff did not present a viable alternative standard to compare her occupation in the national labor market. Finally, Mr. Radke, on whose opinions Plaintiff heavily relies on, stated in his report that Myers' job "is best represented by DOT # 187-117.010, Administrator of a Health Care Facility." The Court therefore adopts the DOT definition chosen by LINA and will compare Myers' physical capabilities with those of an "Administrator, Health Care Facility."

The Court's decision to utilize this DOT occupation makes irrelevant much of Plaintiff's evidence in support of her own motion. Because Myers' actual tasks as a "Community Manager" will not be included in determining LTD benefits, the FCE and vocational assessments stating that she could not meet the requirements of the job in which she was actually engaged are irrelevant. In fact, the FCE and assessments stated that she could work "light" duty – the applicable standard under the DOT definition. This is sufficient to defeat Plaintiff's motion for

summary judgment as to the LTD benefits for the first 24 months, as there is evidence that Plaintiff was not disabled from working in her "regular occupation." There is other evidence as well to deny Plaintiff's summary judgment motion, including Dr. Collins statement that she was fit for "light work/office duty" and that he envisioned her returning to a job involving a fair amount of walking or standing some time beyond two months after surgery (July 2006). Finally, although consideration of Dr. Brenman's report is not necessary to conclude that Plaintiff is not entitled to summary judgment, his report stated that Myers could work at "light duty."[12]

The question remains whether there is any evidence that Myers was "disabled" from her "regular occupation" that would lead to denial of Defendant's summary judgment motion as well. Given the DOT occupation and its job description, Myers need only submit evidence that, if believed, would show that she could not perform "light duty" in order to create a material dispute under the LTD Policy's terms. See *Diaz*, 499 F.3d at 645.

The Court concludes that there is sufficient evidence in the administrative record to create a question of fact on that issue as well, including statements made by Dr. Collins and Mr. Radke, as well as the determination by the Social Security Administration that Myers was totally disabled. Although much of the information contained in Radke's report does not aid Myers' case because it focuses on a comparison between Myers' actual job duties at Belmont Village and her physical abilities, there is at least one pertinent statement that helps Myers' cause: "Clearly, Ms. Myers meets the level of Light work according to the Department of Labor in terms of lifting and carrying. However, it is very obvious she does not meet the level of Light work in terms of standing and walking. Light work requires someone stand and walk on a

---

[12] There is no requirement, under ERISA, that a consultant physically examine the claimant. See *Davis v. Unum*, 444 F.3d 569, 577 (7th Cir. 2006). The reports are, in that sense, permissible. The analysis may change when "the administrator's doctors [are] completely at odds with the claimant's doctors and the medical evidence." *Id.* Any alleged deficiency in the report can be judged by the trier of fact.

frequent basis throughout the day, not occasional to never which was represented in [the FCE] evaluation." Radke overstates the case, in that "light" work does not "require" frequent walking or standing, but merely "can include" walking and or standing frequently. However, all inferences must be drawn in Myers' favor in considering LINA's summary judgment motion, and Radke's view is evidence that Myers was not physically capable of walking on a frequent basis if that was in fact required of her.

Dr. Collins' report from October 2006 came to essentially the same conclusion. He said that Myers could stand/walk "occasionally," but "light" may have required her to do so "frequently." Additionally, Dr. Collins stated that Myers "occasionally" could lift 10 pounds. To meet the requirements for "light" work, Myers would have had to be able to lift 20 pounds "occasionally" and 10 pounds "frequently." The checklist also indicated that she could not balance, stoop, kneel, crouch or crawl. Although these are not specific requirements for "light" work, Myers' inability to perform those tasks could be considered by a trier of fact. Dr. Collins also stated that he would be removing Myers' hardware because she was "fairly disabled." LINA relies on the statement that Myers could perform "light duty/office work." But it simply is not clear that Dr. Collins' definition or understanding of "light work/office duty" is coextensive with the DOT definition. Finally, the determination by the SSA that Myers was disabled, although not dispositive, can be considered as evidence. See *Tegtmeier v. Midwest Operating Eng'gs Pension Trust Fund*, 390 F.3d 1040, 1046 (7th Cir. 2004).

In sum, issues of material fact exist as to whether Myers could have met the requirements of an "Administrator, Health Care Facility." The cross motions for summary judgment are therefore denied as to Myers' claim for LTD benefits for the first 24 months.

### 2.    After 24 months

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is unable to perform all the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience.  Although this is the same standard for "disability" that LINA applied to deny Myers' WOP claim, the different standard of review that applies to Myers' disability claims and the state of the record on which this claim comes before the Court prevents it from currently deciding the issue.  The court has denied both parties motions for summary judgment on the LTD benefits for the first 24 months.  It would be premature to grant or deny benefits beyond that period.[13]   Accordingly, to the extent that either party moved for summary judgment on this issue, those motions are denied.

### 3.    Opportunity to Review and Comment

The remaining issue is whether LINA was obligated to provide Myers with Dr. Brenman's peer review report before LINA issued its final decision.  Myers made that request twice prior to LINA's denial, but LINA did not honor the request before issuing its final ruling. Myers claims that "failure to share evidence developed during appeal with the claimant justifies remand."  The argument appears predicated on a claim for denial of "full and fair review."  The cases cited by the parties indicate that the circuits are split on this issue.  But it is not necessary for this Court to weigh in on the issue under the present facts.  Where, as here, the court "reviews" an administrator's decision *de novo*, the Court must make an independent assessment of the evidence in any event.  See *Diaz*, 499 F.3d at 643.

---

[13] It is worth noting that Myers did not even seek such benefits as a remedy in her initial brief.

**V.       Conclusion**

Plaintiff's motion for summary judgment [21] is denied.  Defendant's cross-motion for summary judgment [31] is granted in part and denied in part.  It appears that all that remains to be decided in a bench trial is whether Plaintiff can recover long term disability benefits for the roughly 21 months that they were denied to her.[14]  The Court will set a status hearing by separate minute order.

Dated:  March 19, 2009

_____
Robert M. Dow, Jr.
United States District Judge

_____

[14] Myers could recover LTD benefits under the "regular occupation" standard for the first 24 months in which benefits were payable.  She received LTD benefits for close to three of those months – from May 14, 2006 to August 3, 2006.